IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PAUL PETTICREW, | § § § | |
| Plaintiff, | § § | |
| V. | § § | CIVIL ACTION NO. 4:13-CV-2119 |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | § § § § § § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

FRANCES H. STACY, United States Magistrate Judge.

Before the Court in this social security appeal is Plaintiff's Motion for Summary Judgment (Document No. 15), and Memorandum in Support (Document No. 16), and Defendant's Motion for Summary Judgment (Document No. 17) and Memorandum in Support (Document No. 18). After considering the cross motions for summary judgment, the administrative record, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment (Document No. 17) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 15) is GRANTED, and the decision of the Commissioner is REMANDED for further proceedings.

**I. ISSUES**

Plaintiff, Paul Petticrew, brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security Administration ("Commissioner") denying his application for disability benefits. According to Petticrew, substantial evidence does not support the Commissioner's decision. Specifically, Petticrew claims that the Administrative Law Judge (ALJ), Thomas Norman, failed to include dizziness into his Residual Functional Capacity (RFC) finding. Moreover, Petticrew claims that additional evidence submitted to the Appeals Council diluted the record so that there is a reasonable probability that the ALJ would have made a different RFC finding that would entitle Petticrew to Social Security disability benefits from February 11, 2011 to December 4, 2012. Petticrew seeks an order reversing the Commissioner's decision and remanding his claim for further proceedings. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Petticrew was not disabled, and that the evidence submitted to the Appeals Council does not sufficiently dilute the record to justify reversing or remanding Petticrew's claim.

## II. ADMINISTRATIVE PROCEEDINGS

On August 1, 2011, Petticrew applied for disability insurance benefits under Title II of the Social Security Act. (Tr. 147-48). Petticrew alleged disability beginning on February 10, 2011 as a result of seizures, anxiety, emphysema, lumbar pain and weakness, dizziness, high cholesterol, and depression. (Tr. 172). The Social Security Administration denied his application at the initial and reconsideration stages (Tr. 86-87). The ALJ held a hearing on October 25, 2012 in Houston Texas. (Tr.18). The ALJ issued his opinion and held that Petticrew was not disabled from the alleged onset date of February 10, 2011 to the date of the ALJ's opinion, December 4, 2012. (Tr. 29).

Petticrew then sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 1). The Appeals Council will grant a request to review an ALJ's decision if any of the following

circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. After considering Petticrew's contentions, including the submission of additional evidence, in light of the applicable regulations and evidence, the Appeals Council, on June 7, 2013, concluded that there was no basis upon which to grant Petticrew's request for review. (Tr. 1). The ALJ's findings and decision thus became final. Petticrew has timely filed his appeal of the ALJ's decision. 42 U.S.C. § 405(g). This appeal is now ripe for ruling.

### III. STANDARD FOR REVIEW OF AGENCY DECISION

The court, in its review of a denial of disability benefits, is, only: "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel,* 174 F.3d 692, 693 (5th Cir.1999). Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris,* 602 F.2d 1233, 1236 (5th Cir.1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's

decision. *Chaparo v. Bowen,* 815 F.2d 1008, 1009 (5th Cir.1987); *see also Jones v. Apfel,* 174 F.3d 692, 693 (5th Cir.1999); *Cook v. Heckler,* 750 F.2d 391 (5th Cir.1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir.1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir.1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.' " *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983) (quoting *Hemphill v. Weinberger,* 483 F.2d 1127 (5th Cir.1973)).

## IV. BURDEN OF PROOF

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson v. Bowen,* 864 F.2d 340, 344 (5th Cir.1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if he is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan,* 954 F.2d 289, 293 (5th Cir.1992) (quoting *Milan v. Bowen,* 782 F.2d 1284 (5th Cir.1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, he will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents him from doing any other substantial gainful activity, taking into consideration his age, education, past work experience, and residual functional capacity, he will be found disabled.

*Id.,* 954 F.2d at 293; *see also Leggett v. Chater,* 67 F.3d 558, 563 n. 2 (5th Cir.1995); *Wren v. Sullivan,* 925 F.2d 123, 125 (5th Cir.1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel,* 168 F.3d 152, 154 (5th Cir.1999). Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990). If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett,* 67

F.3d at 563.

In the instant action, the ALJ determined, in his December 4, 2012 decision, that Petticrew was not disabled at step five because he retained the RFC to engage in unskilled medium work, and unskilled medium work jobs were found to exist in significant numbers in the national economy. (Tr. 23, 29). In particular, the ALJ determined that Petticrew was not presently working (step one); that Petticrew's symptomatic localization related epilepsy, temporal bone fracture history, depressive disorder, and polysubstance abuse were severe impairments (step two); that Petticrew did not have an impairment or combination of impairments that met or medically equaled one the listed impairments in Appendix 1 of the regulations (step three); that Petticrew had the RFC to perform medium work; that Petticrew was unable to perform his past relevant work as an electrician (step four); and that Petticrew's impairments did not prevent him from performing jobs that exist in the national economy, taking into consideration his age, education, work experience, and RFC to perform medium, unskilled occupations such as an laundry worker, hand packager, and equipment cleaner (step five). (Tr. 20-29).

## V. MEDICAL EVIDENCE AND BACKGROUND INFORMATION

### A. AGE, EXPERIENCE, AND WORK HISTORY

At the time of Petticrew's alleged disability onset date, Petticrew was 55 years old, and is thus, considered an individual of advanced age. 20 C.F.R. § 416.963(e). Petticrew was an electrician from 1975 to 2007, and the highest educational level Petticrew has earned is a general equivalency diploma. (Tr. 28, 160-61).

**B. EVIDENCE BEFORE THE ALJ**

On January 22, 2009, Petticrew arrived at the Micheal A. DeBakey VA Medical Center (VAMC) via ambulance, and complained of stabbing chest pain. (Tr. 481). Petticrew claimed that the chest pain was made better by "taking a few beers." *Id.*

On August 2, 2009, Petticrew arrived at Memorial Hermann Hospital and claimed that he had been robbed and assaulted a week earlier, which resulted in a head injury. (Tr. 569). Dr. Thomas J. Mims, MD, diagnosed Petticrew with left and right-sided temporal skull fractures. (Tr. 468-69, 569). Petticrew also tested positive for opiates (Tr. 378).

On August 28, 2009, Petticrew complained of right ear pain, ringing in right ear, and loss of balance, arising from a July 2009 assault. (Tr. 477). He tested positive for alcohol. (Tr. 475). Petticrew claimed to drink two to three times per week, drinking three to four drinks each time. *Id.*

On September 30, 2009, Dr. Karuna Dewan, MD, believed that Petticrew's dizziness could be due to concussion syndrome. (Tr. 466, 469).

On October 28, 2009, Petticrew was prescribed Meclizine for dizziness, but he stopped taking the Meclizine because he claimed that it did not work. (Tr. 464). Three days later, the Houston Fire Department transported Petticrew to the Memorial Hermann Hospital after Petticrew had a witnessed seizure. (Tr. 580). It was noted that Petticrew did not take any medications to prevent seizures. *Id.*

On December 18, 2009, audiologist Ashley Schilling diagnosed Petticrew with a loss of hearing due to the right temporal bone fracture. (Tr. 291-92, 460). Ten days later, bystanders found Petticrew unresponsive, and the Houston Fire Department transported Petticrew to Memorial Hermann Hospital. (Tr. 588, 590). Dr. Cesla diagnosed Petticrew as having a seizure,

and a contusion of the back of the head. *Id.* A test revealed C5-C6 intervertebral disc height loss, vertebral endplate sclerosis, and a probable fracture of the right nasal bone. (Tr. 594). A CT scan dated December 28, 2009, showed a hypodensity in the right inferior frontal cortex and white matter. (Tr. 593).

On March 23, 2010, an ambulance transported Petticrew to Memorial Hermann Hospital after Petticrew had a suspected seizure. (Tr. 454). A CT scan showed no hemorrhage or acute intracranial abnormality. (Tr. 459). The medical report noted that Petticrew was non-compliant with seizure medication. (Tr. 287). Petticrew denied being dizzy at the time of the visit. (Tr. 457). Two days later, audiologist Ashley Schilling fitted Petticrew with a hearing aid. (Tr. 451-52).

On April 6, 2010, Petticrew had a witnessed seizure at a bar, and bystanders noted that he was not drinking alcohol prior to the seizure. (Tr. 495, 498). An ambulance transported Petticrew to Memorial Hermann Hospital. *Id.* Petticrew reported dizziness prior to having the seizure but denied dizziness when at hospital. (Tr. 498). Petticrew stated that he had not been taking seizure medications for years. *Id.* On April 28, 2010, Petticrew reported that his dizziness was getting better and he denied being dizzy at the time. (Tr. 446-47). During a neurology consult on April 29, 2010, Petticrew reported dizziness with ambulation, auditory hallucinations, and depression. (Tr. 441).

On June 29, 2010, an ambulance transported Petticrew to Memorial Hermann Hospital after he had a seizure. (Tr. 504). At the primary follow-up appointment, active problems that were noted in the report included depression, dizziness, seizure disorder, and depression. (Tr. 430). Petticrew denied dizziness in the review of symptoms. *Id.* The assessment noted Petticrew's prescription Keppra as causing some dizziness. (Tr. 432). Petticrew claimed to drink

three to four alcoholic beverages at a time, two-three times a week. (Tr. 435). A PHQ-2 screen indicated a score of four, which is a positive screen for depression. *Id.* A CT scan of Petticrew's brain was unremarkable. (Tr. 511).

On September 2, 2010, resident physician Samish Dhungana noted that Petticrew was not very compliant with medication and that Petticrew continues to have seizures as a result. (Tr. 427-28). Dhungana also noted dizziness since 2009 head trauma as previous medical history. (Tr. 426). Dr. Chen concurred in Dhungana's assessment. (Tr. 428).

On October 19, 2010, Petticrew had a witnessed epileptic seizure and was treated at Methodist Sugarland Hospital. (Tr. 228, 238). On October 20, 2010, Dr. Muhammad Khan, MD, diagnosed Petticrew as having a breakthrough seizure, and recommended increasing Petticrew's dosage of Keppra. (Tr. 238-39). Dr. Khan Faisal conducted an EEG, which showed an "abnormal EEG showing focal slowing in the right fronto central region with occasional sharps and spikes… that may have epileptogenic potential." (Tr. 249). A CT scan of Petticrew's cervical spine was negative for acute trauma. (Tr. 243). A CT of Petticrew's brain was unremarkable. (Tr. 242).

On December 17, 2010, resident physician Sharonda Clark diagnosed Petticrew with depression disorder not otherwise specified, and noted a Global Assessment of Functioning (GAF) score of 60. (Tr. 280-81). The report noted that Petticrew drank four to five beers per week. (Tr. 409). Petticrew reported back pain during this visit. (Tr. 282, 417).

On January 18, 2011, bystanders found Petticrew lying in bushes. (Tr. 520). Petticrew arrived at the Memorial Hermann Hospital via ambulance with white powder on his nose after having a seizure. (Tr. 517, 521). Petticrew smelled of alcohol and it was noted that Petticrew had probable alcohol abuse. (Tr. 518, 521).

On a February 24, 2011 treatment plan, Dr. Connie Zajicek, MD, noted that Petticrew would start Zoloft for depression. (Tr. 403). Petticrew also complained of back pain during this visit. *Id.* Dr. Zajicek assessed Petticrew as having a GAF score of 55. (Tr. 404).

A psychosocial assessment dated March 10, 2011, noted Petticrew's history of arrests, which include two arrests for DWI, one arrest for possession, and six arrests for public intoxication. (Tr. 389). Petticrew claimed that he "drinks six/packs [of alcohol] a week." (Tr. 394).

On March 14, 2011, staff psychiatrist Jocelyn Ulanday diagnosed Petticrew as having depression not otherwise specified and noted that a medical doctor would prescribe medication to alleviate depression. (Tr. 371, 385). Noted medical problems included dizziness, fracture, depression, and seizure disorder. (Tr. 371). Petticrew also claimed that he had auditory hallucinations. (Tr. 379). Dr. Ulanday included depression and substance abuse to be included as problems to be listed on Petticrew's master treatment plan. (Tr. 384-85). Petticrew's GAF score was estimated at 50. (Tr. 384).

From May 16, 2011 to May 20, 2011, Petticrew was admitted to the VACM because of seizure-like activity. (Tr. 260). Dr. David Chen, MD, noted that poor medical compliance likely caused high seizure frequency. (Tr. 305). Petticrew also claimed to have had at least five emergency room visits due to seizures, but records at the time only showed two visits over previous two years. *Id.* Nonetheless, the record indicates that Petticrew visited Memorial Hermann Hospital due to seizures at least six times in the two years preceding this visit. (Tr. 454, 495, 498, 504, 517, 521, 580, 588, 591). Symptomatic localization-related epilepsy was the suspected diagnosis. (Tr. 260, 305). A V-EEG showed intermittent right temporal focal slowing, and occasional right mid-temporal spikes. (Tr. 267). Dr. Chen noted that Petticrew reported

being seizure free for over twenty years while taking Tegretol. (Tr. 309). Nurse practitioner Romay Franks noted depression and drinking six packs a week as psycho-social morbidities. (Tr. 307). On the discharge instructions, Dr. Chen noted that "AS TOLERATED (no limitations in weight bearing, lifting, mobility, driving, bathing, sexual activity, and can return to work)." (Tr. 314).

On June 4, 2011, Petticrew called VAMC complaining of having a seizure, and of having lower back pain. (Tr. 301, 303). Petticrew was advised to go to the VAMC emergency room, but there is no indication did so. (Tr. 301).

On June 12, 2011, Petticrew suffered a left temporal lobe hemorrhage after he fell from a bar stool, and was brought to Memorial Hermann Hospital by ambulance. (Tr. 528, 539). Petticrew suffered a seizure, but it is unclear if the seizure caused him to fall off the stool. (Tr. 534). Petticrew was intoxicated, so he was unable to provide an accurate history of the event. (Tr. 534-35). Dr. Giao Quynh Duong diagnosed Petticrew with an intracranial hemorrhage, and noted Petticrew as an alcohol abuser (blood studies revealed an elevated alcohol level). (Tr. 526, 530). Petticrew reported drinking three to four beers a day for years. (Tr. 534). A CT scan revealed a large focal area of hemorrhage involving the left temporoparietal region with edema. (Tr. 541).

On July 16, 2011, Petticrew was found unconscious at a bar, and an ambulance transferred him to Memorial Hermann Hospital. (Tr. 544). The clinical impression was alcohol intoxication. (Tr. 545). The report indicated that Peticrew was "inebriated [and] smell[ed] heavily of ETOH." (Tr. 544).

On August 20, 2011, Petticrew crashed a vehicle after having a seizure, and an ambulance transferred him to the Memorial Hermann Hospital. (Tr. 557-59).

On August 30, 2011, Dr. Richard Campa, Ph.D, conducted a Social Security Administration psychiatric review analyzing the time period of February 10, 2011, to August 30, 2011. (Tr. 595). Dr. Campa found Petticrew to suffer from depression and alcohol dependence, but found that there was insufficient evidence to make a decision regarding functional limitations. (Tr. 598, 603, 605).

On September 1, 2011, Petticrew complained of having baseline dizziness "all the time" to the attending nurse practitioner. (Tr. 676). The next day, Petticrew was found in a park suspected of having a seizure, and had a seizure in the ambulance on the way to the Memorial Herman Hospital. (Tr. 656). He was postictal when admitted to the emergency room. *Id.* The treating physician believed that Petticrew probably experienced a multifactorial seizure resulting from alcohol withdrawal (no alcohol detected in system), as well as subtherapeutic Dilantin level. (Tr. 657). Dr. Calvin Tsao noted that Petticrew suffered from degenerative spondylosis at C5-C6 level of the cervical spine. (Tr. 660).

On September 22, 2011, Dr. Randal Reid, MD, completed a physical RFC assessment. (Tr. 663). Dr. Reid noted that Petticrew had a history of non-compliance with seizure medications, and that Petticrew denied having back pain. (Tr. 670). Dr. Reid also noted that Petticrew should never climb ladders, ropes, or scaffolds, only occasionally climb ramps or stairs, and to avoid all exposure to workplace hazards. (Tr. 665, 667). Dr. Reid did not limit balancing, stooping, kneeling, crouching, or crawling. (Tr. 665).

On December 13, 2011, Dr. Lonnecker completed a psychological evaluation for use by the Social Security Administration. (Tr. 682-690). Dr. Lonnecker found that Petticrew had low average intelligence, and a GAF score of 60. (Tr. 685, 689). Dr. Lonnecker also diagnosed Petticrew with a depressive disorder not otherwise specified, and polysubstance abuse. (Tr. 688).

In the evaluation, Petticrew stated that he picks up cans during the day to get change for food. (Tr. 683).

On January 11, 2012, Dr. Marler, Ph.D, completed a psychiatric review for use by the Social Security Administration, and analyzed the period of February 10, 2011 through January 11, 2012. (Tr. 692). Dr. Marler found depressive disorder not otherwise specified, and alcohol, cocaine, and cannabis abuse as medically determinable impairments. (Tr. 695, 700). Dr. Marler also found that Petticrew's functional limitations included mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace, but he did not find any episodes of decompensation of extended duration. (Tr. 702).

On January 18, 2012, Dr. Marler, Ph.D, completed a Mental RFC assessment of Petticrew and noted that Petticrew "can understand, remember and carry out only simple instructions, make simple deductions, attend and concentrate for extended periods, interact adequately with supervisors and coworkers and respond appropriately to changes in a routine work setting." (Tr. 708).

On a June 15, 2012 radiology report, Dr. Joan Bitar, MD, noted that Petticrew had mild loss of height of several mid-thoracic vertebral bodies with resulting mild kyphosis. (Tr. 794).

On a July 9, 2012, nurse practitioner Romay Franks noted that Petticrew stated that he only took his medications "if [he] remember[s]." (Tr. 781). Petticrew complained of back pain, and baseline dizziness. (Tr. 781, 784).

**C. ADDITIONAL EVIDENCE SUBMITTED TO THE APPEALS COUNCIL**

Petticrew submitted additional medical evidence to the Appeals Council that was not before the ALJ. The Appeals Council ultimately denied Petticrew's request for review because

the new evidence was not "contrary to the weight of the evidence of record." (Tr. 1-2). The following is a summary of the additional evidence submitted to the Appeals Council.

On July 2, 2008, Petticrew went to the VAMC and complained of being beaten up in a bar and being kicked in his face. (Tr. 830). Petticrew complained that he may have injured his lower back, and that his nose may have been broken. *Id.* A spine x-ray showed "chronic ant displacement." *Id.* On the radiology report, Dr. Umair Shah's findings were "anterolisthesis of L5 on S1 is identified by 1.6cm. Intervertebral disc space narrowing, sclerosis, and endplate changes are noted at L5-S1 consistent with degenerative change. Diffuse atherosclerotic calcifications are noted throughout the descending aorta." (Tr. 838). Dr. Shah's impression was "anterolisthesis of L5 on S1 by 1.6cm with spondylosis" with "no acute abnormality." *Id.*

On an April 28, 2008 radiology report, Dr. Kelly Thomas noted "mild loss of height of midthoracic vertebra with kyphoscoliosis." (Tr. 860). The ALJ had medical evidence of mild loss of height, but no medical evidence regarding kyphoscoliosis.

On a January 11, 2013 radiology report, Dr. Samara Martinez's impression included degenerative disc disease. (Tr. 924). Dr. Martinez also instructed the reader of the report to "please tell [Petticrew] he has arthritis of the back…[and a] pinched nerve in the back." (Tr. 917-18).

On a February 15, 2013 radiology report, Dr. Tae Kim recommended a neurosurgical consultation after finding "Grade 2 anterolisthesis of L5 on S1. Complete loss of intervertebral disk space at L5-S1… [and] L5 on S1-related severe foraminal stenosis." (Tr. 896-97). On February 22, 2013, a neurosurgery consult request was entered. (Tr. 885). The reason for the referral and/or chief complaint was "bilateral pars defects at L5 with grade 2 anterolisthesis of L5 on S1. No spinal stenosis. L5 on S1-related severe foraminal stenosis (near-effacement)." *Id.*

## VI. THE ALJ DID NOT ERR WHEN HE DISCOUNTED PETTICREW'S STATEMENTS CONCERNING THE INTENSITY, PERSISTENCE, AND LIMITING EFFECTS OF DIZZINESS BECAUSE HE PROPERLY FOUND PETTICREW AS NOT WHOLLY CREDIBLE.

Petticrew contends that the RFC finding does not take into account limitations based on his dizziness. A RFC finding is defined as the most that someone can do despite recognized limitations. 20 CFR § 404.1545(a)(1). The RFC should be based on all of the relevant information in the case record. 20 CFR § 404.1545(a)(3). The Court holds that there is substantial evidence that the ALJ accounted for Petticrew's dizziness when formulating his RFC, and that the ALJ properly discounted Petticrew's dizziness claim based on Petticrew's lack of credibility and lack of compliance with seizure medication. The ALJ determined that Petticrew "has no neurological deficits, no orthopedic abnormalities, and no dysfunctioning of the bodily organs that would preclude medium work," and that the "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Tr. 24).

Credibility determinations, such as that made by the ALJ in this case in connection with Petticrew's subjective complaints, are generally within the province of the ALJ to make. *See Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir.1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.' ") (quoting *Scott v. Heckler,* 770 F.2d 482, 485 (5th Cir.1985)), *cert. denied,* 514 U.S. 1120 (1995).

The ALJ considered Petticrew's non-compliance with his medication in determining his credibility. (Tr. 25). For instance, the ALJ noted that an examination on May 23, 2011 revealed Petticrew had "poor medication compliance," despite a "history of a good response from Tegretol." *Id.* A claimant's non-compliance with treatment is a proper factor for the ALJ to

consider in assessing credibility. *Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir.1990). This factor weighs in favor of the ALJ. [1]

Objective medical evidence also supports the ALJ's RFC finding regarding Petticrew's dizziness claim. Specifically, the ALJ notes on September 22, 2011, Randall Reid, MD, "reviewed the claimant's medical records and completed a physical residual functional capacity assessment form concerning the claimant." (Tr. 27). "Dr. Reid reported that the claimant did not have any established exertional limitations... [except that] the claimant had to take seizure precautions." *Id.*

Furthermore, the ALJ specifically considered Petticrew's claim of dizziness. (Tr. 23). The ALJ noted that Petticrew testified that he had dizziness and drowsiness that could occur once a day, and that he would have to sleep for thirty minutes to two hours as a result. *Id.* The ALJ indicated that Petticrew "must take the usual seizure precautions of avoiding unprotected heights or climbing ladders, ropes, and scaffolds." *Id.* The ALJ also indicated that the "claimant must avoid moving or dangerous equipment and open flames... [as well as] commercial driving." *Id.* These precautions could be due to his epilepsy, but they could also be partially due to his claims of dizziness. As such, whether the ALJ specifically noted that some of the listed precautions account for Petticrew's dizziness, the precautions would have most likely been the same.

The ALJ properly considered the evidence of record and provided a well-reasoned

---

[1] The ALJ additionally noted in his decision that Petticrew over reported seizures: "while he reported five emergency room visits, the investigation showed only two emergency room visits (Exhibit B-2F, page 51)." (Tr. 25). This statement does not appear to be supported by the record given the sheer number of times Petticrew was transported by ambulance to the Memorial Herman Hospital emergency room, as set forth above. Because the case should be remanded for full consideration of additional evidence, *see infra* at 17-20, and because Petticrew did not raise this issue in his motion for summary judgment, it will not be used as an independent basis for remand.

analysis in support of his credibility finding. In disputing this assessment, Petticrew requests the Court to reweigh the evidence, retry the issues, and substitute its own judgment for that of the ALJ, which it is not permitted to do. *Greenspan,* 38 F.3d at 236. The Court finds that substantial evidence supports the ALJ's credibility assessment regarding Petticrew's dizziness claim as it relates to his RFC.

## VII. SUBSTANTIAL EVIDENCE DOES NOT SUPPORT THE COMMISSIONER'S UNFAVORABLE DECISION BECAUSE ADDITIONAL EVIDENCE SUBMITTED BY PETTICREW AFTER THE ALJ'S DECISION SUFFICIENTLY DILUTES THE RECORD.

Petticrew submitted additional evidence to the Appeals Council after the ALJ issued his decision denying Petticrew's application for disability benefits. According to Petticrew, the Commissioner's decision is not supported by substantial evidence because the evidence submitted to the Appeals Council dilutes the record to the extent that there is a reasonable probability that the ALJ would have changed his decision in light of the additional evidence. Having reviewed that additional evidence in the context of the evidence that was considered by the ALJ, the Court agrees.

Under Fifth Circuit precedent, "evidence submitted for the first time to the Appeals Council is part of the record on appeal [.] *Higginbotham v. Barnhart,* 405 F.3d 332, 337 (5th Cir.2005). Therefore, when a claimant such as Petticrew submits new evidence and the Appeals Council denies review after considering the evidence, "the Commissioner's final decision necessarily includes the Appeal Council's conclusion that the ALJ's findings remained correct despite the new evidence." *Id.* at 336 (internal quotation marks and citations omitted). The Appeals Council is not, however, required to provide a detailed analysis of, or otherwise explain the weight to be given, to new evidence. *See Higginbotham,* 405 F.3d at 335 n. 1. Remand is warranted only if the new evidence *dilutes* the record to such an extent that the ALJ's decision

becomes insufficiently supported. *Higginbotham v. Barnhart,* 163 F.App'x 279, 281–82 (5th Cir.2006) (emphasis added).

Specifically, Petticrew argues that his RFC determination should have limited him to light or sedentary work, rather than medium work. A RFC finding of light or sedentary work would require the Commissioner to find Petticrew disabled under the medical-vocational guidelines. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.07, 202.06. The Social Security Administration's table of medical-vocational guidelines requires the agency to find a claimant disabled if the claimant is of advanced age (over the age of 55), has at least a high school education, and has previously held a skilled or semi-skilled job that he can no longer perform, unless he has job skills that are transferrable. *Id.* Because the ALJ found that Petticrew could do medium work, he did not evaluate transferability of job skills. (Tr. 28). Light work:

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b). Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

In evaluating the materiality of the additional evidence submitted to the Appeals Council, the Court must address "(1) whether the evidence relates to the time period for which the disability benefits were denied, and (2) whether there is a reasonable probability that this new evidence would change the outcome of the Secretary's decision." *Ripley v. Chater,* 67 F.3d 552, 555 (5th Cir.1995). Both criteria are satisfied here.

All of the evidence submitted to the Appeals Council relates back to the relevant time period of February 10, 2011 to December 4, 2012, and is material to Petticrew's RFC

determination. On July 8, 2008, Dr. Umair Shah's found that Petticrew had "anterolisthesis of L5 on S1 is identified by 1.6cm. Intervertebral disc space narrowing, sclerosis, and endplate changes are noted at L5-S1 consistent with degenerative change. Diffuse atherosclerotic calcifications are noted throughout the descending aorta." (Tr. 838). Dr. Shah's impression was "anterolisthesis of L5 on S1 by 1.6cm with spondylosis" with "no acute abnormality." *Id*. A spine x-ray also showed "chronic ant displacement." (Tr. 830). Moreover, on an April 28, 2008 radiology report, Dr. Kelly Thomas noted that Petticrew has "kyphoscoliosis." (Tr. 860). This evidence relates back to the relevant time period because it predates the alleged onset date of February 11, 2011.

The evidence dated from 2013 also relates back to the relevant time period. The additional evidence is dated just a couple months after the ALJ made his decision, so the conditions listed in the additional evidence likely existed during the relevant period and are not just signs of subsequent deterioration of a previously non-disabling condition. *See Falco v. Shalala,* 27 F.3d 160, 164 (5th Cir.1994). Moreover, some of the February 2013 evidence seem to confirm Dr. Shah's findings of 2008, and is therefore sufficiently related to the relevant time period. Concededly, it is unclear whether Petticrew had the following conditions during the relevant time period: (1) *grade 2* anterolisthesis (no grade identified in 2008 evidence), (2) severe foraminal stenosis, (3) degenerative disc disease, (4) pinched nerve, or (5) arthritis of the back. Medical experts should opine as to whether Petticrew had these conditions during the relevant time period.

In any event, the 2008 evidence standing alone sufficiently dilutes the record because there is a reasonable probability that this evidence would have affected the outcome of the Commissioner's decision. In finding that Petticrew was not disabled, the ALJ rejected Petticrew's subjective complaints of back pain presumably because there was no objective

medical evidence to validate his complaints. The ALJ is prohibited from making a finding of disability unless the subjective complaints of pain are backed by objective medical evidence. 42 U.S.C. § 423(5)(A). Had the ALJ considered the additional evidence Petticrew submitted to the Appeals Council, he could have found that Petticrew was only capable of performing light or sedentary work, which would require the ALJ to find Petticrew disabled, so long as Petticrew had no transferable job skills. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, §§ 202.07, 202.06. With the additional evidence, the ALJ may have included back pain as a severe impairment, and may have lowered Petticrew's RFC to light work as a result.

## VIII. CONCLUSION

Based on the foregoing, and the conclusion that substantial evidence does not support the Commissioner's decision given the additional evidence submitted to the Appeals Council, the Court

ORDERS that Defendant's Motion for Summary Judgment (Document No. 17) is DENIED, Plaintiff's Motion for Summary Judgment (Document No. 15) is GRANTED, and that this case is remanded to the Social Security Administration pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Memorandum and Order.

Signed at Houston, Texas, this 22nd day of June, 2014.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE